## May, Com'r. of Agriculture, Labor and Statistics, v. Clay-Gentry-Graves Tobacco Warehouse Co.

Nov. 22, 1940.

William B. Ardery, Judge.

Hubert Meredith, Attorney General, and Jesse K. Lewis, Assistant Attorney General, for appellant.

Robert H. Hays and B. S. Grannis, amici curiae.

Leslie W. Morris and Marion Rider for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

The sole question for determination on this appeal is the proper construction and application of Section 7 of Chapter 12 of the Acts of the General Assembly at its 1940 regular session. The chapter is printed in the Session Acts for that year, beginning on page 82. Its title reads: "An Act to provide for the supervision, regulation and licensing of tobacco warehouses and for the bonding of weighmen in tobacco warehouses and authorizing the Commissioner of Agriculture to conduct an investigation in selling costs of tobacco." It consists of sixteen sections with an incorporated heading placed at the beginning of each section. As enacted, enrolled and printed, Section 7, with its heading, thus appears: "Discrimination Prohibited.—No warehouse or warehouseman shall discriminate against any grower of tobacco by failing to accord to such grower or growers all privileges and services extended to any other grower, nor shall any warehouse or warehouseman refuse to admit any tobacco to the warehouse floor so long as there is space available or reserved space for the placing of said tobacco upon the floor for the purpose of sale."

The act placed its administration and enforcement with the Commissioner of Agriculture, Labor and Statistics, and this declaratory judgment action was brought in the Franklin Circuit Court by appellee and plaintiff, Clay-Gentry-Graves Tobacco Warehouse Company, against the Commissioner of Agriculture, supra,

504

seeking the advice of the Court as to the scope and effect of the words "or reserved space" inserted in next to the last line of the section. It was alleged that there was a bona fide dispute as to the effect of those words, i. e., whether the purpose of the legislature in incorporating them in the section was to prohibit the reservation of floor space by producers from warehousemen in their warehouses for the deposit of tobacco to be sold by them at the next succeeding sales day, or whether it was the purpose to compel warehousemen to allow delivery of tobacco and its deposit in their warehouses as long as there was unoccupied space and which had not been reserved by other producers?

One group of interpreters construe the act as nullifying the practice of reserving floor space heretofore indulged in and permitted; whilst another group contend that under the terms of the section the warehouseman would be compelled to permit and accept the deposit of tobacco in his warehouse as long as there was unoccupied space, unless it had theretofore been reserved by other producers who intended and purposed to occupy it with their tobacco in time for the next succeeding sale. The learned judge of the Franklin circuit court upon submission, and after all necessary preparations were made, held "that Section 7 of Chapter 12 of the Acts of 1940 General Assembly prohibits booking of space by warehouses and warehousemen in the manner set out in the petition of the plaintiff, or in any other manner." Seeking a reversal of that adjudged interpretation, plaintiff prosecutes this appeal.

The practice of reserving space for such purpose by the producers or growers of tobacco in advance of sales was theretofore long indulged in and the act of doing so was referred to as the granting of "booking space." The practice should continue unless it is prohibited by the section of the act under consideration, since without a prohibitive statute it invades no law, constitutional or statutory. The question to be determined is an extremely narrow one and its solution should be made according to the ripened rules for the interpretation of statutes, the most prominent of which is the ascertainment of the intention and purpose of the legislature in so enacting. In arriving at that conclusion the statute under consideration as a whole should be looked to, and if from such a comprehensive view the ambiguity or confusion may

be unraveled and corrected, it should be so adjudged. If, however, confusion still exists following such a review, then other considerations may be resorted to, prominent among which is the history of the legislation from the time of its inception when first introduced until it became a completed enactment by both houses of the General Assembly and considered by the Governor if he acts with reference thereto within the constitutional limit of time provided for that purpose. Also, it is permissible in order to solve such difficulties, and in the pursuit of the legislative intent, to take into consideration, not only the title to the act, but likewise the headings of the sections if they are incorporated in the act, which, as we have said, is the situation here.

It is also permissible for courts, after applying the rules supra, to transpose or even supply words when it is rendered necessary in order to effectuate the clear and manifest intention of the legislature in enacting the statute. Each rule referred to is approved in cases listed under Key Number System 197 and including Key Number System 203, in Volume 17 of West's Kentucky Digest, under the subject of Statutes and appearing on pages 412 and 413 of that volume. The right to resort to "Title, Headings, and Marginal Notes," is shown by cases listed in Key Number System 211 of the same volume on page 415. The holdings of our domestic opinions so listed in the volume of the Digest referred to are in accord with general rules relating to the subject as expounded and approved by acknowledged text writers in the discussion and treatment of the applicable rules of law in such cases.

The text in Volume 25, R. C. L. 1006, Section 247, says, inter alia: "Hence, it is an established rule in the exposition of statutes that the intention of the law-giver is to be deduced from a view of the whole, and of every part of the statute taken and compared together." The long list of cited cases in note 8 to that excerpt confirms the entire absence of all dissent from that proposition. Advancing to more specific treatment of the question, the text on page 1031, Section 267, of the same R. C. L. volume, approves the right of the court in proper circumstances to resort to titles, headings of sections, and to the history of the litigation from its inception to its final passage as a means of ascertaining the intention of the legislature (which, we repeat, is the supreme con-

trolling objective), in the enactment of the statute under consideration. Likewise, the text on page 1035, Section 268 of the same volume, permits the consideration of the history, circumstances and condition existing prior to the enactment with reference to the involved subject matter so that the court may be placed in the exact position of the legislature while considering and enacting the law under consideration. Further along and on page 1037 (Sections 269 and 270) of the same volume, the text authorizes consideration of messages, if any, of the chief executive in his dealing with the particular legislation, as well as the debates in the respective houses by its various members while the act was under consideration, and which the journals of each house disclose, the latter right being authorized by the text on page 1039, Section 271 of the same volume.

Other parts of that treatise, as well as the text in 59 C. J. 986, Section 584, authorize—in extreme exigencies rendered necessary to give some effect to the statute—the substitution of words for those employed in the statute when it becomes clearly necessary in order to remove the repugnancy, ambiguity and confusion, which if literally applied would destroy the statute entirely because of complete obscurity of the legislative intent in enacting it. The following section (585) in the latter publication (59 C. J.) authorizes the giving of an affirmative effect to negative expressions (and vice versa) if necessary to effectuate the otherwise plain intention of the legislature. No text writer dissents from the foregoing rules as contained in the two works referred to, and for that reason we will list herein none of the others.

We have already referred to the volume, page and sections of the Digest of our opinions containing domestic cases approving the enunciated rules referred to, but for the convenience of the profession we append the following: Martin v. Louisville Motors Company, 276 Ky. 696, 125 S. W. (2d) 241, and Green v. Moore, 281 Ky. 305, 135 S. W. (2d) 682, relating to the intention of the legislature as being the supreme rule for the guidance of the court. Commonwealth v. Bartholomew, 265 Ky. 703, 97 S. W. (2d) 591; Nichols v. Logan, 184 Ky. 711, 213 S. W. 181, and Commonwealth v. Stahr, 162 Ky. 388, 172 S. W. 677, on the right to discard surplus language and the substitution or re-arrangement of words

when manifestly essential to render the statute in accord with the legislative intent, as gathered from a comprehensive review of it in the light of the foregoing rules in all cases when the facts and the situation permits their application. Wheeler v. Board of Commissioners of the City of Hopkinsville, 245 Ky. 388, 53 S. W. (2d) 740; Talbott v. Laffoon, 257 Ky. 773, 79 S. W. (2d) 244, and Grieb v. National Bond & Investment Company, 264 Ky. 289, 94 S. W. (2d) 612, on the right to resort to titles, headings, &c., if necessary to arrive at the legislative intent.

In the light of the authority conferred by the approved declarations of the law as so briefly outlined, we will now proceed to employ them for the accomplishment of the task before us. It is, to arrive at the intention and purpose of the legislature in enacting the instant statute in the adoption of the words "or reserved space" inserted at the place indicated in its Section 7 of the Act, and finally, what meaning and application should be given that section with reference to "reserve space" as heretofore permitted by tobacco warehousemen?

To begin with, the act in its title only purports to provide for the supervising, regulation and licensing of warehouses. We learn from the record of the proceedings of the house chamber of the legislature in which the act was first introduced—and was designated "House Bill No. 407"—that the section as enacted by that body was in this language: "Reservation of Floor Space Prohibited. No warehouse or warehouseman shall reserve any floor space for any producer or consignor of tobacco, nor shall he discriminate against any grower of tobacco by failing to accord to such grower or growers all privileges and services extended to any other grower, nor shall any warehouse or warehouseman refuse to admit any tobacco to the warehouse floor so long as there is space available for the placing of said tobacco upon the floor for the purpose of sale."

That section as so enacted did two things, i. e., (a) prohibited discrimination against any grower of tobacco by the warehouseman in the granting of any privilege or in the rendition of any service to its customers and requiring that they should all receive uniformity of treatment; and (b) that it expressly prohibited the res-

ervation of space (theretofore understood as "booking space") "for any producer or consignor of tobacco." The statute with its Section 7 as so enacted was then sent to the upper House, or Senate, of the legislature, and the Rules Committee of that body amended it by striking therefrom the words "reserve any floor space for any producer or consignor of tobacco, nor shall he", and also striking the title, or heading, of the section, then reading "Reservation of Floor Space Prohibited," and substituting another heading reading "Discrimination Prohibited." So that, after such amendments the section with its heading would read: "Discrimination Prohibited. No warehouse or warehouseman shall discriminate against any grower of tobacco by failing to accord to such grower or growers all privileges and services extended to any other grower, nor shall any warehouse or warehouseman refuse to admit any tobacco to the warehouse floor so long as there is space available for the placing of said tobacco upon the floor for the purpose of sale." The adopted Senate amendments referred to eliminated from the section as passed by the House all prohibition against the theretofore practice of reserving floor space and confined the section to the *prohibition* of *discrimination* by the warehousemen as among growers of tobacco in the granting of floor space or any other privilege, and compelling them to receive and store tobacco "so long as there is space *available*" for the purpose. The statute, therefore, upon the adoption of such amendments became diametrically changed and left the question as to the right of reserving space untouched and to continue, the same as it had theretofore existed.

But before the section as so amended was finally voted on, some member offered an amendment which was adopted inserting between the words "available" and "for" the words "or reserved space," and—described in slang terms—that amendment was "the monkey wrench thrown into the machine." With the adoption of that amendment by the Senate after the adoption of the preceding two, the section was finally passed and later concurred in by the House, in which the act originated; and thus we have the section as it now appears. From the radical action taken by the Senate in first entirely eliminating from the section any prohibition of the practice of booking or reserving space, which

changes were later concurred in by the House, it would seem to most clearly appear that it was *not* the intention or purpose of the Senate in making that change to prohibit the right of reservation theretofore practiced, and it would seem anomalous that it would then immediately turn around and restore the section by the adoption of the third and last amendment supra, to practically its original purpose when passed by the House. The intention not to do so is so strong, as indicated by the heading of the section which the Senate adopted, as to overcome, as we conclude, the literal meaning of the last Senate amendment inserting the words ''or reserved space'' in the section if it should be construed as prohibiting the reservation of space which it was clearly not the intention of the members of the Senate to do in the light of what they had immediately done before.

The Governor, to whom the bill was delivered after its passage in both houses as amended, wrote a message approving the act, and in which he analyzed the situation as above outlined, and expressed his conclusion thus: ''It is obvious that the last amendment meant to specify 'or *un*reserved space' in order to be in harmony with the first amendment. Since through inadvertence this error occurred and the meaning is not clear. But since the intent of the Legislature was indicated in the major amendment as desiring to remove from the bill that portion of it which would have made it unlawful to reserve floor space on tobacco warehouses, such will be (the) construction placed on the bill as it is administered.''

It will be observed that the only suggested alteration by the Governor of any language contained in the section as finally enacted was prefixing to the word ''reserved'' as contained in the last Senate amendment, the syllable ''un'' which made the section conform to the unmistakable and most conclusively established intention as had just been manifested by the two first adopted amendments, whereby the diametrical change referred to was made. We are convinced that the authorized rules supra for the interpretation of statutes in such conditions justified that interpretation, and that in so concluding the Governor was correct.

But, independently of the foregoing method of arriving at the intention of the legislature so as to ascer-

tain its intention from the language it employed, and looking alone to the phraseology actually employed in the section as finally enacted, we are convinced that it is more susceptible to the interpretation permitting a continuance of the practice of reserving floor space than it is to a contrary intention prohibiting that practice. It will be remembered that the language is "nor shall any warehouse or warehouseman refuse to admit any tobacco to the warehouse floor so long as there is space available or reserved space for the placing of said tobacco upon the floor for the purpose of sale." A fairly plausible interpretation of that language is, that warehousemen must admit the deposit of tobacco in their warehouses from all growers so requesting as long as there is available space for the purpose, or reserved space theretofore procured by the applicant who had theretofore been granted space. In that view the compulsory admittance of the tobacco in the warehouse would obtain so long as there was space available to the one who had not reserved space, and to compel the warehouseman to observe his agreement with all growers who had theretofore reserved space. In other words, the purpose was, as expressed in the section, to compel undiscriminating observance of all obligations on the part of the warehouseman to his customers, including that of the reservation of "space for the placing of said tobacco;" "said tobacco" being both that owned by the reserver of space, as well as by those who had not reserved space. Therefore, in either view of the case we conclude that the learned trial judge was in error in the interpretation he gave to the involved section, and that it should be so construed as *not* to prohibit the reservation of booking privileges for warehouse space for the bulking of growers of tobacco to be sold at the next succeeding sales day, but without discrimination in this regard.

Wherefore, the judgment is reversed, with directions to set it aside and for proceedings in conformity with this opinion.

Whole Court sitting except Judge Perry, who was absent.